IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA *ex rel.* BETTY ANNE POMPILIUS, | ) ) ) | |
| Plaintiffs, | ) ) | Case No: 2:11 cu 1055-MHT |
| v. | ) ) | **FILED UNDER SEAL** |
| HOSPICE ADVANTAGE, INC., and RON HILDEBRANDT, | ) ) ) | **DO NOT PLACE IN PRESS BOX DO NOT ENTER ON PACER** |
| Defendants. | ) ) | **DEMAND FOR JURY** |

## *QUI TAM* COMPLAINT

Plaintiff-Relator Betty Anne Pompilius, on behalf of herself and the United States of America, alleges and claims against Hospice Advantage, Inc. and Ron Hildebrandt as follows:

### JURISDICTION AND VENUE

1.     This action arises under the False Claims Act, 31 U.S.C. §§ 3729-33 (the "False Claims Act"). Accordingly, this Court has jurisdiction pursuant to 28 U.S.C. § 1331.  Jurisdiction is also authorized under 31 U.S.C. § 3732(a).

2.     Venue lies in this judicial district pursuant to 31 U.S.C. § 3732(a), because Defendants qualify to do business in the State of Alabama, transact substantial business in the State of Alabama, transact substantial business in this judicial district, and can be found here. Additionally, and as described herein,

Defendants committed within this judicial district acts proscribed by 31 U.S.C. § 3729. Specifically, Defendants submitted and caused to be submitted within this judicial district false claims for hospice care for ineligible patients and false claims for palliative care which should have been paid for by Defendants, and made or used false records material to such claims

## PARTIES

3. Defendant Hospice Advantage, Inc. ("Hospice Advantage") is a for-profit, Medicare-certified hospice provider with its principal place of business in Bay City, Michigan. Hospice Advantage offers Medicare-supported hospice services in six states from at least 20 different locations, including Birmingham, Alabama. Hospice Advantage is owned and operated by Defendant Rod Hildebrandt, who at all times relevant to this Complaint had actual or apparent authority to submit bills on behalf of Hospice Advantage to the United States for payment and to submit certifications to the United States regarding Hospice Advantage's compliance with Medicare regulations. As described herein, Hospice Advantage has perpetrated a fraudulent scheme to bill the United States for ineligible hospice patients.

4. Plaintiff-Relator Betty Anne Pompilius is a Registered Nurse with over four years of experience in the hospice industry. In June, 2010, Ms. Pompilius was hired by Hospice Advantage as a Clinical Quality Assurance

2

Manager and enrolled in a three week orientation program. Over the course of her orientation and employment, Ms. Pompilius reviewed files and saw patients in Defendants' locations across Michigan, Wisconsin, Georgia, and Alabama. She quickly became aware that Hospice Advantage systematically enrolls, recertifies, and falsely bills the United States for hospice patients whose objective medical conditions belie a terminal diagnosis.

5. Through her experience. Plaintiff-Relator has become convinced that Defendants' false certifications, fraudulent billing, and tactics of evasion are widespread, systematic practices endemic to Defendants. Defendants' fraudulent practices offend Plaintiff-Relators' long-standing dedication to the mission of hospice care and to the needs of terminally-ill patients and cause her to file this Complaint on behalf of herself and the United States as a relator under the *qui tam* provisions of the False Claims Act.

6. Prior to filing this Complaint, Plaintiff-Relator voluntarily disclosed to the Government the information upon which this action is based. To the extent that any public disclosure has taken place as defined by 31 U.S.C. §3739(e)(4)(A), Plaintiff-Relator is the original source of the information for purposes of that Section. Alternatively, Plaintiff-Relator has knowledge that is independent of and materially adds to any purported publicly disclosed allegations or transactions, and Plaintiff-Relator voluntarily provided that information to the Government before

3

filing this Complaint. Plaintiff-Relator is serving contemporaneously herewith a statement of the material evidence in her possession upon which her claims are based.

## THE MEDICARE HOSPICE BENEFIT

### I.   Background

7.     Through the Medicare Program ("Medicare"), Title XVIII of the Social Security Act, 42 U.S.C. §§ 1395, et seq., the United States provides health insurance coverage for eligible citizens. Medicare is overseen by the United States Department of Health and Human Services through its Center for Medicare and Medicaid Services ("CMS").

8.     Through the Medicare Hospice Benefit (Hospice), Medicare pays for hospice care for certain terminally ill patients who elect to receive such care. *See* 42 U.S.C. § 1395d.  A patient is deemed to be terminally ill if the patient "has a medical prognosis such that his or her life expectancy is 6 months or less if the disease runs its normal course."  42 C.F.R. § 418.3.  In electing hospice care, a patient must agree to forego Medicare coverage for curative treatment.  *See* 42 U.S.C. § 1395d.  A patient may at anytime revoke his or her hospice election and resume Medicare Part A coverage.  42 C.F.R. § 418.28.

9.     Defendants' aggressive, profit-maximizing business model represents an intrusion of greed into an institution founded upon philosophical, spiritual, and

4

medical notions of charity and care-giving. The impetus for the modern hospice movement in the United States is attributed to psychiatrist Dr. Elizabeth Kübler Ross, whose 1969 <u>On Death and Dying</u> is acknowledged to have altered modern perceptions about care for the terminally ill. In the 1970s, U.S. hospices opened their doors as volunteer organizations dedicated to bringing comfort and humanity to terminal patients. Testifying in 1975 before the U.S. Senate Special Sub-committee on Aging, Kübler Ross stated: "We should not institutionalize people. We can give families more help with home care and visiting nurses, giving the families and the patients the spiritual, emotional, and financial help in order to facilitate the final care at home." In 1982, Congress created a provisional Medicare Hospice Benefit, made permanent in 1986. By 1990, 800 hospice companies were caring for 76,491 patients, with an average length of stay of 48.4 days.

10.    From such humble, altruistic roots, Hospice has become big business. Medicare hospice payments rose from $205 million in 1989 to $9.2 billion in 2006. In the 1998 article "Hospice Boom Is Giving Rise to New Fraud," the *New York Times* recognized that the hospice infrastructure "was never designed to handle the expanding network of nursing homes, hospices, assisted-care centers and other services popping up to serve the nation's growing aging population." Venture capitalists and other investors have been quick to perceive that the Medicare

Hospice Benefit represents a potentially unlimited stream of income for those who bring aggressive marketing, sales, and growth tactics into the new industry of care for the dying.

11.    Leslie Norwalk, then Acting Director of the Centers for Medicare & Medicaid Services, testified before the U.S. House of Representatives Committee on Ways and Means in 2007 that "Hospice is not intended to be used as a nursing home."  Nevertheless, Defendants and other for-profit Hospice companies have instituted a fraudulent scheme to treat the Medicare Hospice Benefit as an improper subsidy for general nursing home and in-home care and to capitalize on and aggressively market to the nation's rapidly growing elderly population.

## II.    Hospice Benefits, Reimbursements, and Requirements

12.    Hospice covers a broad set of palliative services for qualified beneficiaries who have a life expectancy of six months or less as determined by their physician. *See* 42 C.F.R. § 418.22.  Hospice is designed to provide pain-relief, comfort, and emotional and spiritual support to patients with a terminal diagnosis.    Qualified hospice patients may receive skilled nursing services, medication for pain and symptom control, physical and occupational therapy, counseling, home health aide and homemaker services, short-term inpatient care, inpatient respite care, and other services for the palliation and management of the terminal illness. *See* 42 C.F.R. § 418.202.

6

13.    Through Medicare and/or Medicaid (indirectly through the States), the United States reimburses hospice providers for services to qualified beneficiaries on a *per diem* rate for each day a qualified beneficiary is enrolled. 42 C.F.R. § 418.302. Medicare or Medicaid makes a daily payment, regardless of the amount of services provided on a given day and even on days when no services are provided.   Payments are made according to a fee schedule with four base payment amounts for the four different categories of care: routine home care (RHC), continuous home care (CHC), in-patient respite care (IRC), and general in-patient care (GIC).

14.    In return for the Hospice *per diem* payment, hospices are obligated to provide patients with all covered palliative services.   *See* 42 C.F.R. § 418.202. The hospice must design a plan of care inclusive of all covered services necessary to meet the patient's needs. *See* 42 C.F.R. § 418.56. Among other services, every hospice must provide short-term inpatient care for pain-control and symptom-management related to the patient's terminal illness. *Id.*; *see also* 42 C.F.R. § 418.108.

15.    Medicare will not pay for hospice services provided to patients who are not terminally ill. *See* 42 U.S.C. §1395y.   Furthermore, it is a universal requirement of the Medicare program that all services provided must be reasonable and medically necessary. *See* 42 U.S.C. §1395y (a)(1)(A); 42 U.S.C. § 1396, *et*

7

*seq.*; 42 C.F.R. § 410.50.   Medicare providers may not bill the United States for medically unnecessary services or procedures performed solely for the profit of the provider. *Id.*

16.    Federal law authorizes Medicare administrative contractors ("MACs") and fiscal intermediaries ("FIs") to issue determinations as to the extent of Medicare coverage for particular items or services.    *See* 42 U.S.C. 1395ff. Accordingly, Medicare Hospice MACs and FIs publish local coverage determinations ("LCDs") establishing requirements for and limitations on Hospice coverage.    *See, e.g.,* LCDs Published by Palmetto GBA, Alabama Home Health/Hospice Fiscal Intermediary[1].    Medicare will not pay for hospice care provided to a patient who does not meet LCDs. *See* 42 U.S.C. 1395y.

17.    To enroll as a Medicare providers, Defendants were required to submit a Medicare Enrollment Application for Institutional Providers. *See* CMS Form 855A.    In submitting Form 855A, Defendants made the following "Certification Statement" to CMS:

> I agree to abide by the Medicare laws, regulations and program instructions that apply to this provider. The Medicare laws, regulations, and program instructions are available through the Medicare contractor. I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions

---

[1]  *available at*
http://www.cms.gov/mcd/results_index.asp?from='lmrpstate'&contractor=88&name=Palmetto+GBA+%2800380%2C+RHHI%29&letter_range=4.

(including, but not limited to, the Federal Anti-Kickback statute and the Stark law), and on the provider's compliance with all applicable conditions of participation in Medicare.

Form CMS-855A.

18.     Defendants then billed Medicare by submitting a claim form (CMS Form 1450) to the fiscal intermediary (FI) or Medicare Administrative Contractor (MAC) responsible for administering Medicare hospice claims on behalf of the United States. *See* CMS Form 1450. Each time they submitted a claim to the United States through the FI, Defendants certified that the claim was true, correct, and complete, and complied with all Medicare laws and regulations.

19.     Defendants thus certified that each claim for a hospice *per diem* payment represented a day of care provided to a terminally ill patient, and CMS expressly conditioned its payment on the truth and accuracy of that certification. Defendants further certified that their programs were in compliance with Medicare regulations, including the requirement that Defendants provide short-term in patient care related to their patients' terminal conditions.

## DEFENDANTS' FRAUDULENT SCHEMES

### I.     Billing for Ineligible Hospice Patients

20.     Defendants systematically defraud Medicare and Medicaid by recruiting and cycling non-qualifying patients through their Hospice program.

9

21.     When she assumed her duties as Clinical Quality Assurance Manager, Plaintiff-Relator Pompilius was informed by Vice President of Clinical Services, Ronnie Madaras, "There are problems in Alabama."

22.     In fact, Ms. Pompilius found problems in the charts she reviewed in Michigan, Wisconsin, and Georgia, as well.  Specifically, Ms. Pompilius found that a large number of Defendants patients were not terminally-ill, their clinical information did not support a medically sound diagnosis of terminal illness, and their charts did not demonstrate a decline in condition.

23.     Ms. Pompilius raised this issue with Wisconsin Quality Assurance Manager, Kathleen Perterkin, informing her that many of Defendants' long-length of stay patients did not have recorded medical data supporting terminal diagnoses and should be reviewed for discharge.  Kathleen Perterkin responded: "Oh, no, if we did that we'd have to discharge half our census."

24.     Once Ms. Pompilius assumed her duties in Alabama, she found that many patients there were not terminal and that their charts did not support a hospice diagnosis.  When she reported the situation to her superior Madaras, she was told: "You don't want to be the first [Hospice Advantage] region in the country to repay money.  You need to fix it."

25.     Ms. Pompilius attended several inter-disciplinary team meetings where she witnessed Defendants' fraud being perpetrated.  Defendants' medical

10

directors simply "rubber-stamp" the deficient certifications and re-certifications of terminal illness supplied by staff without reviewing any of the patients' health information or making any reasonable inquiry as to the patients' physical condition, and thus exercise no medical judgment in determining whether it is appropriate for Hospice Advantage to bill Medicare for patients' hospice care.

26.    Ms. Pompilius also "rode along" with Hospice Advantage nurses on nursing visits to patients.  She observed first hand that Defendants' patients are not hospice-eligible.

27.    Ms. Pompilius' recommendations for discharge of non-qualifying patients were frequently refused – as described in detail below – on the grounds that the patients were required to maintain profitable census levels.

28.    Ms. Pompilius reviewed numerous Hospice Advantage charts that were wholly insufficient to support a terminal prognosis.  The following are merely a representative example  of the recent results of Defendants' fraudulent practices; the following patients have been fraudulently certified by Defendants as terminally-ill and falsely billed to the United States through CMS:

a.    Patient  P.R.  was  admitted  to  Defendants'  Sheboygan, Wisconsin location on around August 6, 2008 for "adult failure to thrive." On July 13, 2010, Ms. Pompilius visited P.R. with Kathleen Perterkin and a Hospice Advantage nurse.  P.R.'s chart records her weight at the time of

11

admission as 115 lbs. and her body mass index (BMI) as 22. At the time of Ms. Pompilius' visit, P.R. weighed 126.5 lbs. and her BMI was 24.6 – a gain of weight and mass totally at odds with a "failure to thrive" diagnosis.

     b.    Patient L.B. was on service at Defendants' Troy, Alabama location (formerly known as Light House Hospice). Although L.B. was on service for end-stage heart disease, L.B. was not being maximally treated with vasodilators and diuretics as required by LCDs. Additionally, L.B.'s chart contained no physician certification of terminal illness at the time of admission.

     c.    Patient L.L. was admitted to Defendants' Auburn, Alabama location in or around June, 2010, with a diagnosis of "adult failure to thrive." Patients chart contained no measurements of weight, BMI, or palliative performance (PPS) scores.

     d.    Patient F.B. was admitted to Defendants' Troy, Alabama location on or around February 15, 2008 and had failed to decline by late-2010. When Ms. Pompilius discussed discharging F.B., Clinical Director Susan Outlaw told her that F.B. could not be discharged because Outlaw "needed to keep the census up."

## II.    Fraudulently Billing for Unnecessary, Non-Qualifying General Inpatient Care

29.    Defendants routinely submit false claims to the United States for hospice general inpatient care when, in fact, the services provided do not meet the requirements for such payment.

30.    Federal Regulations require that, in order to charge CMS for GIC, the patient must receive "care in an inpatient facility for pain control or acute or chronic symptom management which cannot be managed in other settings."  42 C.F.R. § 302.  In other words, it must be practically impossible to care for the patient in his or her home. *See id.*

31.    Defendants, however, frequently move patients to the in-patient facility they operate in Auburn, Alabama, known as Bethany House when those patients' conditions do not require or warrant in-patient care.

32.    During the course of her employment, Plaintiff-Relator Pompilius performed a chart audit on Bethany House and found that the vast majority of patients whose care has been billed to the United States did not require GIC.  Ms. Pompilius found that Defendants had transferred patients to Bethany House, and had falsely billed the United States for their care at the GIC rate, when the patients' complications were no more serious than diarrhea or vomiting – conditions that are routinely addressed by hospices in the home setting on a daily basis.  For example, Ms. Pompilius reviewed the chart of patient W.B., on service at Defendants' Auburn, Alabama location under a diagnosis of prostate cancer.  Not only did

13

W.B.'s chart lack any laboratory results necessary to support a terminal cancer diagnosis, W.B. had been repeatedly transferred back and forth from Bethany House without a physician's order and without any condition requiring care in an inpatient environment.

33.     Most perversely, Ms. Pompilius discovered Defendants' practice of transferring near-death patients to GIC care under circumstances that did not warrant such a transfer and with the sole motive of boosting reimbursement. Defendants thus thwart the very goal and purpose of hospice: to provide a comfortable and dignified death at home.

34.     When Ms. Pompilius addressed this issue with Ronnie Madaras, Madaras told her, "This is how it's always been done," and informed her that, without the GIC billings, the area would not be a profitable one for the company.

## COUNT ONE
## PRESENTING OR CAUSING TO BE PRESENTED FALSE CLAIMS
## UNDER 31 U.S.C. § 3729

35.     Plaintiff-Relator adopts and incorporates the previous paragraphs as though fully set forth herein.

36.     By and through the fraudulent schemes described herein, Defendants knowingly – by actual knowledge or in deliberate ignorance or with reckless disregard of the truth or falsity of the information –  presented or caused to be

presented false or fraudulent claims to the United States for payment or approval, to wit:

(a)     Defendants submitted false claims for Hospice care provided to patients whom Defendants knew did not meet Medicare or Medicaid requirements for Hospice, in violation of 42 U.S.C. §1395y;

(b)     Defendants submitted false claims for Hospice care provided to patients admitted under a false diagnosis and to whom Defendants did not provide complete palliative services under a legitimate care plan as required by 42 C.F.R. §§ 418.201; 418.56.

(c)     Defendants submitted false claims for Hospice services premised upon Defendants' fraudulent certifications of compliance with Medicare regulations as made on CMS Forms 885A and 1450 and elsewhere;

(d)     Defendants submitted false claims for Hospice GIC care provided to patients who did not require it and whose care could have been provided in another setting.

37.     The United States paid the false claims described herein and summarized in paragraph 36(a)-(d).

38.     Defendants' fraudulent actions, as described *supra*, are part of a widespread, systematic pattern and practice of knowingly submitting or causing to be submitted false claims to the United States through fraudulent certification and

re-certification of Hospice patients and fraudulent billing of the United States through Medicare or Medicaid.

39.    Defendants' fraudulent actions described herein have resulted in damage to the United States equal to the amount paid or reimbursed to Defendants by the United States through Medicare and Medicaid for such false or fraudulent claims.

WHEREFORE, Plaintiff-Relator demands judgment in her favor on behalf of the United States, and against Defendants, in an amount equal to treble the damages sustained by reason of Defendants' conduct, together with civil penalties as permitted by 31 U.S.C. § 3729, attorneys' fees and costs, and such other, different, or further relief to which Plaintiff-Relator may be entitled.

## COUNT TWO
## MAKING OR USING FALSE STATEMENTS OR RECORDS MATERIAL TO A FALSE CLAIM UNDER 31 U.S.C. § 3729

40.    Plaintiff-Relator adopts and incorporates the previous paragraphs as though fully set forth herein.

41.    By and through the fraudulent schemes described herein, Defendants knowingly – by actual knowledge or in deliberate ignorance or with reckless disregard of the truth or falsity of the information – made, used, or caused to be made or used, false records or statements material to a false or fraudulent claim or to get a false or fraudulent claim paid or approved by the United States, to wit:

16

(a)     Defendants created and used false certifications of terminal illness; false admission paperwork indicating fraudulent diagnoses; false patient care plans not calculated to cope with patients' actual needs and conditions; and other false records intended to support their fraudulent billing to the United States, all in violation of 42 U.S.C. §1395y and the Medicare regulations cited *supra*.

(b)     Defendants made false certifications regarding past, present, or future compliance with a prerequisite for payment or reimbursement by the United States through Medicare or Medicaid, including false certifications on CMS Forms 885A and 1450 as described *supra*, when Defendant was aware that their practices as described herein were in violation of Medicare payment prerequisites, including but not limited to 42 U.S.C. §1395y and the applicable LCDs.

42.    The false records or statements described herein and summarized in paragraph 41(a)-(b) were material to the false claims submitted or caused to be submitted by Defendants to the United States.

43.    In reliance upon Defendants false statements and records, the United States paid false claims submitted by Defendants and others that it would not have paid if not for those false statements and records.

44.    Defendants' fraudulent actions described herein have resulted in damage to the United States equal to the amount paid or reimbursed to Defendants and others by the United States for such false or fraudulent claims.

WHEREFORE, Plaintiff-Relator demands judgment in her favor on behalf of the United States, and against Defendants, in an amount equal to treble the damages sustained by reason of Defendants' conduct, together with civil penalties as permitted by 31 U.S.C. § 3729, attorneys' fees and costs, and such other, different, or further relief to which Plaintiff-Relator may be entitled.

**COUNT THREE**
**"REVERSE FALSE CLAIMS" UNDER 31 U.S.C. § 3729(a)(1)(G)**

45.     Plaintiff-Relator adopts and incorporates the previous paragraphs as though fully set forth herein.

46.     By and through the fraudulent schemes described herein, Defendants knowingly – by actual knowledge or in deliberate ignorance or with reckless disregard of the truth or falsity of the information – made, used, or caused to be made or used, a false records or statement material to an obligation to pay or transmit money or property to the United States, or knowingly concealed or knowingly and improperly avoided an obligation to pay or transmit money or property to the United States, to wit:  Defendant knew that they had received millions of dollars in Hospice *per diem* patients who did not qualify for Hospice, yet Defendants took no action to satisfy their obligations to the United States to repay or refund those payments and instead retained the funds and continued to bill the United States;

47.    As a result of Defendants fraudulent conduct, the United States has suffered damage in the amount of funds that belong to the United States but are improperly retained by Defendants

WHEREFORE, Plaintiff-Relator demands judgment in her favor on behalf of the United States, and against Defendants, in an amount equal to treble the damages sustained by reason of Defendants' conduct, together with civil penalties as permitted by 31 U.S.C. § 3729, attorneys' fees and costs, and such other, different, or further relief to which Plaintiff-Relator may be entitled.

## COUNT FOUR
## CONSPIRACY UNDER 31 U.S.C. § 3729(a)(3)

48.    Plaintiff-Relator adopts and incorporates the previous paragraphs as though fully set forth herein.

49.    Defendants knowingly presented, or caused to be presented, to an officer or employee of the United States Government, false or fraudulent claims for payment or approval, to-wit: Defendants knowingly certified and/or re-certified Hospice patients whom they knew did not qualify for Medicare or Medicaid reimbursement and presented or caused to be presented false claims to the United States through Medicare or Medicaid for payment of same.

50.    The Government paid Defendants for such false claims.

51.    Defendants, in concert with their principals, agents, employees, subsidiaries, and other institutions did agree to submit such false claims to the United States.

52.    Defendants and its principals, agents, and employees acted, by and through the conduct described *supra*, with the intent to defraud the United States by submitting false claims for payment to the United States through Medicare or Medicaid.

53.    Defendants' fraudulent actions, together with the fraudulent actions of its principals, agents and employees, have resulted in damage to the United States equal to the amount paid by the United States to Defendants and others as a result of Defendants' fraudulent claims.

WHEREFORE, Plaintiff-Relator demands judgment in her favor on behalf of the United States and against Defendants, in an amount equal to treble the damages sustained by reason of Defendants' conduct, together with civil penalties as permitted by 21 U.S.C. § 3729, attorneys' fees, costs, interest, and such other, different, or further relief to which Plaintiff-Relator may be entitled.

## COUNT FIVE
## SUPPRESSION, FRAUD, AND DECEIT

54.    Plaintiff-Relator adopts and incorporates the previous paragraphs as though fully set forth herein.

55.    Defendants misrepresented or suppressed the material fact that a substantial number of their patients enrolled in Hospice do not qualify for Hospice and are not terminally ill.

56.    Defendants were legally obligated to communicate to the United States that they had enrolled patients to Hospice and that they had billed the United States for services to patients who do not qualify for Hospice and who are terminally ill.

57.    Such misrepresentations were made willfully to deceive or recklessly without knowledge.

58.    The United States acted on Defendants' material misrepresentations described herein to its detriment.

59.    Defendants' fraudulent actions described herein have resulted in damage to the United States equal to the amount paid by the United States to Defendants and others as a result of Defendants' fraudulent claims.

WHEREFORE, Plaintiff-Relator demands judgment in their favor on behalf of the United States and against Defendants pursuant to 31 U.S.C. § 3732 and Ala. Code §§ 6-5-101, 6-5-102, and 6-5-103 in an amount sufficient to compensate the United States for Defendant's fraud, suppression, and deceit, together with punitive damages in an amount calculated to deter Defendant from engaging in such

21

conduct in the future, along with attorneys' fees, costs, interest, and any other, further, or different relief to which Plaintiff-Relator may be entitled.

Date:  December ___, 2011.

_____
HENRY I FROHSIN
JAMES F. BARGER, JR.
J. ELLIOTT WALTHALL
**Attorneys for Plaintiff-Relator**
**Betty Pompilius**

**OF COUNSEL:**
FROHSIN & BARGER, LLC
One Highland Place, Suite 310
2151 Highland Avenue
Birmingham, Alabama 35205
Tel:   205.933.4006
Fax:   205.933.4008

## RELATOR DEMANDS A TRIAL BY STRUCK JURY

On this the _____ day of December, 2011, Plaintiff-Relator hereby certifies

that in compliance with Federal Rule 4 of the Civil Rules of Procedure, service of

the *Qui Tam* Complaint has been executed as follows:

**By Certified Mail to:**

United States Attorney, George L. Beck, Jr.
U. S. Attorney's Office
131 Clayton Street
Montgomery, AL 36104

Attorney General of the United States
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530-0001

OF COUNSEL